Filed 6/2/23  Peterson v. Harris CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| SABRINA PETERSON, | B315356 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 21STCV07836) |
| v. | |
| CLIFFORD HARRIS et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, David Sotelo, Judge.  Reversed in part and remanded with directions.

Berk Brettler, Andrew B. Brettler, Jake A. Camara; Lavely & Singer and Kelsey J. Leeker, for Defendants and Appellants.

Ivie McNeill Wyatt Purcell & Diggs, Rodney S. Diggs, for Plaintiff and Respondent.

In January 2021, plaintiff Sabrina Peterson posted a video and messages to her Instagram account accusing defendants Clifford and Tameka Harris (entertainers who perform under the stage names "TI" and "Tiny") of various forms of sexual and physical abuse.[1] Peterson also accused Clifford of previously threatening her with a handgun. Clifford, Tameka, and Tameka's friend, codefendant Shekinah Jones Anderson, responded to Peterson through their social media accounts. These responses serve the basis for Peterson's lawsuit against Clifford, Tameka, and Anderson. The Harrises filed a special motion to strike every cause of action against them under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[2] After finding their conduct to be protected activity, the trial court found Peterson had established a probability of prevailing on the merits of all seven causes of action. In so finding, the court accepted post-complaint evidence attributing Anderson's accusation against Peterson to the Harrises. The court denied the motion.

The Harrises appeal the trial court's order and contend Peterson was prohibited from amending her complaint with post-complaint evidence attributing Anderson's statements

---

[1] Clifford and Tameka share the same last name. In the interests of clarity, we refer to them by their first names.

[2] Unspecified statutory references are to the Code of Civil Procedure.

2

to the Harrises.  They also challenge the court's finding of minimal merit on each cause of action.

We conclude the trial court properly considered post-complaint evidence to clarify the claims that Peterson asserted against the Harrises and affirm the denial in part. However, we reverse the court's order with respect to Peterson's causes of action for trade libel, intentional and negligent interference with prospective economic advantage, and intentional infliction of emotional distress.  On remand, the trial court shall determine an award of attorney fees in favor of the Harrises for partially prevailing on their motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND
### A.  Peterson's Complaint

The complaint, filed March 1, 2021, set forth the following allegations concerning an ongoing public dispute between Peterson and the Harrises.  Peterson has known the Harrises personally for over a decade.  Peterson is an award-winning business coach, entrepreneur, and founder of Glam University, a company designed to "coach women who are interested in entrepreneurship."  The Harrises are well-known musicians, producers, and television personalities. Codefendant Anderson is a reality television personality who has appeared on a television show covering the Harrises.

At some point during the parties' friendship, Peterson got into an altercation with Clifford's assistant.  Responding to the altercation, Clifford placed a gun to Peterson's head

3

and said, "'Bitch I'll kill you.'" Peterson ceased communicating with Clifford but maintained her friendship with Tameka.

In January 2021, Peterson was the victim of a carjacking. To cope with this traumatic experience, on January 26, 2021, Peterson "shared her traumatic experience with [Clifford] to a group of her followers" on Instagram. As established by the evidentiary submissions discussed below, Peterson also posted messages she had received from other women accusing Clifford and Tameka of various forms of sexual, physical, and emotional abuse. Clifford, Tameka, and Anderson issued various statements responding to Peterson's Instagram posts.

In every cause of action, the complaint alleged that Clifford, Tameka, and Anderson "posted certain statements on the public internet site Instagram to their more than 23.6 million followers" and sought to hold all three liable for the statements. The complaint identifies the posts or public statements as follows:

1. ***The Posts on the Harrises' Instagram Accounts***

On January 26, 2021 (the same day Peterson revealed the prior incident involving Clifford), Tameka posted to her Instagram account a photograph of Clifford standing alongside Peterson's eight-year-old son. Attached to the photograph was the following message:

4

> "'Hold up. . . So you want your abuser to train your sons? He was just uncle 2 years ago . . . now when did you say my husband assaulted you? Did you change your mind or change it back? What's up wit you today Pooh? . . . You strange. Everybody know you been special. . . .'"

Tameka's Instagram account has 6.6 million followers.

In a statement released to the public January 29, 2021, the Harrises "'emphatically den[ied] in the strongest way possible the egregiously appalling allegations being made against them by [ ] Peterson." The same day, Clifford posted a video to his Instagram account in which he stated:

> "'Whatever we ever have done has been done with consensual adults . . . . [¶] We ain't never forced nobody, we ain't never drugged nobody against their will. We ain't never held nobody against their will. We never made nobody do anything. We never [sexually] trafficked any[body]. . . . [¶] I also want you to know there's evil at play. . . . We've had a history in dealing with the particular individual in question.'"

Clifford's Instagram account has 13.5 million followers.

### 2.    *The Post on Anderson's Instagram Account*

Also on January 29, 2021, Anderson posted a video to her Instagram account. In the video, Anderson stated:

"'She's looking for fucking attention. She wants [Tameka]. She has sex with [Tameka], she wants [Tameka] to be her girlfriend. Now listen, this is my thing, [s]he came out and [Clifford] pulled a gun on her. . . .

"'She has a problem. But she ain't talking about how she fucked Tamika [*sic*] too. I said what I said. Why she ain't talking about she done sucked his dick and fucked her in her pussy. . . . I'm trying to figure out why she ain't tell ya'll about how much pussy she ate? Why she didn't tell ya'll about she wanted the women who used to go recruit the bitches for him to fuck?

"'What's up? . . . Go ask her why [she] ain't tell you she didn't get fucked and she went to the apartment? Why she didn't tell ya'll if she done had somebody that did too?'"

Anderson's Instagram account has 3.5 million followers.

### 3.   *The Causes of Action*

Peterson's complaint asserted seven causes of action, all against Clifford, Tameka, and Anderson: (1) defamation; (2) trade libel; (3) false light invasion of privacy; (4) intentional and (5) negligent interference with prospective economic advantage; and (6) intentional and (7) negligent infliction of emotional distress. The complaint incorporated all of the parties' statements into each cause of action.

6

## B.    The Anti-SLAPP Proceedings[3]
### 1.    *The Harrises' Special Motion to Strike*

The Harrises filed a motion to strike all seven causes of action based on conduct in furtherance of their right to speak on an ongoing public controversy created by Peterson.  As to the merits, the Harrises argued none of their statements asserted a provably false statement of fact.  To the extent their statements implied Peterson had lied about Clifford threatening her with a gun, the implication was truthful.  In support, they argued Peterson was a "proven liar" because she pled guilty to lying in a prior criminal matter.  In addition, the Harrises argued Anderson's statement could not be attributed to them personally, as "there is no allegation that the Harrises were responsible or in any way connected to those statements allegedly made by her."

The Harrises filed a supporting declaration by their attorney Andrew Brettler.  Attached to Brettler's declaration were court records from a criminal matter involving Peterson in 2011.  Those records reflected a guilty plea in which Peterson admitted she had "denied know[ing] an individual named 'P. Denis,' when in fact she knew of and had lived with [this] individual."[4]  Also attached to Brettler's

---

[3]    Anderson filed her own motion to strike, and the court denied the motion.  Anderson dismissed her appeal from the denial of her motion.

[4]    Peterson pled guilty to Section 1011(a)(2) of title 18 of the United States Code, which prohibits making "any materially false, . . . statement or representation" within the branches of the United States government.

7

declaration were various news articles covering the parties' dispute. One article reported that in mid-to-late January 2021, Peterson had "posted a series of [direct message] screenshots from more than a dozen anonymous women who accused [Clifford] and [Tameka] of sexual abuse and other transgressions." Peterson posted the screenshots with the following superimposed captions: "Refer to Women as His Cattle?"; "Kidnapping Story from Neighbor!"; "Kids Forced into a Closet at Gunpoint"; and "Drugged into a [C]orpse [S]tate?"

### 2.    *Peterson's Opposition*

In opposition, Peterson acknowledged "the Harrises are public figures and the allegations regarding their conduct" implicated issues of public interest. She argued, however, that the Harrises' statements implied the provably false assertion that Peterson had lied about Clifford threatening her with a gun. In addition, Peterson argued the Harrises had directed Anderson to make the salacious sexual accusations on Instagram.

Peterson filed supporting declarations from herself and her attorney Rodney Diggs. In her declaration, Peterson averred the Harrises "began an online campaign of harassment" and "enlisted" Anderson to harass, defame, and discredit Peterson on Instagram. Around May 2, 2021 (several months after Peterson filed the complaint), Anderson admitted in a video posted to her Instagram account that she had been "instructed" by Tameka to make

8

the salacious sexual accusations against Peterson.  As a result of the defendants' statements, Peterson declared she had lost "over 30% of [her] personal clients and clients of Glam U," and was unable to attract investors to another business venture in cannabis.  In addition, Peterson averred she suffered symptoms of emotional distress.

In his declaration, Diggs stated it had "always been" Peterson's intent to pursue every cause of action against the defendants together.  But because the complaint had been filed before Anderson admitted she had been directed to make the salacious sexual accusations, Peterson did not specifically allege this supporting fact in her complaint.  Diggs indicated that Peterson would file an amended complaint conforming to the post-complaint evidence if possible.

### 3.   *The Reply*

The Harrises argued Peterson could not "replead her claims" against them based on post-complaint evidence attributing Anderson's accusations to them individually.

### 4.   *Hearing and Order*

The court held a hearing on the Harrises' motion, after which it took the matter under submission.  By subsequent written order, the trial court denied the motion.  The court found the Harrises had satisfied their burden of showing each cause of action arose from protected activity within the meaning of section 425.16, subdivisions (e)(3) and (e)(4).  In

so finding, the court found the parties' controversy bore upon matters of public interest, namely violence and sexual abuse in the entertainment industry. However, the court concluded Peterson had established a likelihood of prevailing on each cause of action based on two statements attributable to the Harrises: (1) their implied statement that Peterson lied about the gun incident involving Clifford; and (2) Anderson's statement that Peterson engaged in salacious sexual conduct.[5]

The Harrises filed a timely notice of appeal.

## DISCUSSION

Section 425.16 "provides a procedure for the early dismissal of what are commonly known as SLAPP suits (strategic lawsuits against public participation)—litigation of a harassing nature, brought to challenge the exercise of protected free speech rights. The section is thus informally labeled the anti-SLAPP statute." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3; *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21; see § 425.16, subd. (b)(1).)

---

[5] The court preliminarily noted that "the only defamatory statements in contention [were] the comments surrounding the accusation that Peterson was lying about the gun to the head threat." The court acknowledged the complaint "in its current state does not attribute Andersons's statements to the Harrises." Nevertheless, the court attributed Anderson's statements to the Harrises, as "the statements permit a reasonable inference [the Harrises] approved or authorized" Anderson making them.

10

Ruling on an anti-SLAPP motion requires a familiar two-prong approach. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) Our review of the trial court's decision to grant or deny an anti-SLAPP motion is de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

## A. Prong One: Protected Activity

Under this prong, the court must determine whether the moving parties made a prima facie showing that some or all of the plaintiff's claims arise from an act in furtherance of their rights of petition or free speech. (§ 425.16, subd. (e).) As we shall discuss, we agree with the Harrises that Peterson's claims arise from protected activity made in a place open to the public or public fora in connection with issues of public interest. (§ 425.16, subds. (e)(3) & (4).) Courts employ a two-part test to determine whether speech concerns a matter of public issue or public interest.

First, courts must determine what public issue or issue of public interest the speech implicates. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1249 (*Geiser*); *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).) Statements implicating public interest include (1) persons "in the public eye"; (2) conduct that "could directly affect a

11

large number of people beyond the direct participants"; and (3) "topic[s] of widespread, public interest." (*Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.)

Second, courts analyze the relationship between the speech and the public conversation about the matter of public interest, and whether the activity contributes to public discussion on the issue. (*Geiser, supra*, 13 Cal.5th at p. 1249; *FilmOn, supra*, 7 Cal.5th at pp. 149-150.) Viewed from the position "of a reasonable objective observer," courts must consider context (the identity of the speaker, the audience sought, the timing and location of the speech, and the apparent purpose of the conduct) to determine whether there is "'some degree of closeness'" between the speech and the topic of public interest. (*Geiser, supra*, at pp. 1254-1256.)

The statements made by Clifford, Tameka, and Anderson in this case implicated issues of public interest. Issues of "public interest" often include ongoing controversies concerning "high profile individuals . . . subject to extensive media scrutiny." (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1254 (*Jackson*); accord, *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 807-808 (*Seelig*).)

Clifford and Tameka are accomplished musicians and producers, and both have a television show covering their lives. Peterson herself is a successful entrepreneur and business coach who has been featured in well-known

publications. The controversy under which this case arose directly concerns gun violence and sexual abuse by those in the entertainment industry. The many articles covering this controversy clearly establish the public's interest in it. (Accord, *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 239-240 [reporting well-known political consultant's violence against former wives implicated public interest].)

Even assuming the statements did not implicate a public issue or issue of public interest, they are still protected as activity encouraging participation "in the context of an ongoing controversy." (*D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1215; *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.) Peterson voluntarily thrust herself into the public eye by accusing Clifford of gun violence and the Harrises of various forms of sexual, physical, and emotional abuse. All of the statements appearing in the complaint were responsive to Peterson's own public revelations against the Harrises. As such, Peterson has "subjected herself to inevitable scrutiny . . . by the public and the media." (*Seelig*, *supra*, 97 Cal.App.4th at p. 808.)

Finally, the activity of Clifford, Tameka, and Anderson all occurred in a public forum for purposes of section 425.16, subdivision (e)(3). With one exception,[6] all of their

---

[6]     It is unclear if the Harrises' joint statement denying the accusations by Peterson was posted to their Instagram accounts. *(Fn. is continued on the next page.)*

13

statements were published on Instagram and could be readily accessed by 3.5 to 13.5 million followers.  (Accord, *Jackson, supra,* 10 Cal.App.4th at p. 1252; *Briganti v. Chow* (2019) 42 Cal.App.5th 504, 508 (*Briganti*).)  The Harrises have met their initial burden, and we therefore proceed to prong two of the anti-SLAPP analysis.

## B.      Prong Two:  Probability of Prevailing on the Merits

To demonstrate a probability of prevailing on all or some of her claims, Peterson must "'demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'  [Citation.]" (*Briganti, supra,* 42 Cal.App.5th at p. 509.)  However, because the anti-SLAPP statute permits early intervention in lawsuits, "the plaintiff's burden of establishing a probability of prevailing is not high:  We do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.  [Citation.]  Only a cause of action that lacks 'even minimal merit' constitutes a SLAPP." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699– 700.)

---

Nevertheless, Peterson acknowledges this statement was released to the public through various news outlets.

### 1. *Identifying Peterson's Claims*

Before we address each cause of action against the Harrises, we must identify the "claims" on which those causes of action are asserted against the Harrises. In other words, we must identify the "basis of [ ] conduct" on which "the various causes of action . . . sought to impose liability." (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713 (*Taus*); accord, *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012 [courts must identify the conduct "*on which liability is based*"].) That is particularly true where, as here, the defendants seek "to strike *particular claims* supported by allegations of protected activity that appear alongside *other claims* within a single cause of action. . . ." (*Baral*, *supra*, 1 Cal.5th at pp. 391-392, italics added.)

Here, the trial court found Peterson's claims were based on (1) the implied statement that Peterson lied about Clifford threatening her with a gun; and (2) the accusations that Peterson engaged in sexual contact with the Harrises and recruited women for the same. Peterson concurs in the trial court's framing of her claims. The Harrises acknowledge the former claim but dispute the latter.

In this regard, the Harrises contend Peterson may not attribute Anderson's statement to them based on new allegations and evidence presented during the SLAPP proceedings. The Harrises argue that the evidence presented by Peterson in opposition to the motion amends the complaint, and they rely on *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073 (*Simmons*) and its progeny

for the general rule prohibiting leave to amend once the first prong of the anti-SLAPP statute is met.  (*Id.* at p. 1074; accord, *Jackson, supra,* 10 Cal.App.5th at p. 1263 [the court must "take the complaint as it is"].)  *Simmons* crafted this rule to avoid gamesmanship and the "procedural quagmire" in which plaintiffs "disguise the vexatious nature of the[ir] suit through more artful pleading."  (*Simmons, supra,* 92 Cal.App.4th at pp. 1073-1074.)[7]

---

[7]     Courts have applied the *Simmons* rule in two circumstances not present here:  (1) when the proposed amendment seeks to overcome the defendant's initial burden under prong one of the anti-SLAPP analysis; and (2) when the proposed amendment seeks to assert for the first time that a defendant is liable for statements not found in the complaint.  (See *Simmons, supra,* 92 Cal.App.4th at p. 1073 [amendment sought to "remove any allegations that might be . . . protected"]; *Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 900 [amendment provided new statements "not identified or referred to in the [operative] complaint"]; *Jackson, supra,* 10 Cal.App.5th at pp. 1263, 1264, fn. 10 [same].)

Further, *Simmons* did not "erect[] an absolute bar to amendment."  (*Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 869, 873 (*Nguyen-Lam*).)  Rather, courts have permitted amendments that purport "to meet [the plaintiff's] burden on the second prong [based on] timely submitted facts already before the court.  In such cases, . . . the trial court need only rule on the [anti-SLAPP] motion and facts already under consideration."  (*Id.* at p. 872.)  "Where the evidence submitted for the motion enables the plaintiff to demonstrate the requisite probability of prevailing on the merits of her defamation claim, the policy concerns against amendment in the anti-SLAPP context do not apply because the plaintiff's suit—shown to be likely
*(Fn. is continued on the next page.)*

16

Here, Peterson's complaint alleged that Clifford, Tameka, and Anderson "posted certain statements on the public internet site Instagram to their more than 23.6 million followers," and Peterson sought to hold all three defendants liable for every cause of action asserted. The facts probative of the Harrises' liability for Anderson's Instagram posts "emerged through the evidence the parties submitted for the hearing on the strike motion." (*Nguyen-Lam, supra*, 171 Cal.App.4th at p. 868; see *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1021 ["nothing in the [anti-SLAPP] statute or case law suggests that the factual analysis for ruling on the motion must be frozen in time on the date the complaint is filed"].)[8] After Peterson initiated this action, Anderson admitted she had been "enlisted" by the Harrises and directed by Tameka to make the accusations against Peterson on Instagram. The additional information provided in connection with the

meritorious—is not a strategic lawsuit against public participation." (*Id.* at p. 863.) Further, such an amendment does not risk "thwart[ing] with delay" the procedure under section 425.16. (*Id.* at p. 872.) Thus, a court may deny an anti-SLAPP motion where, after the first prong of the analysis is met, the allegations of a cause of action can be amended conforming to proof presented to state a cause of action upon which the plaintiff has the requisite probability of success. (*Id.* at p. 874.)

[8] The Harrises do not address Peterson's duty of pleading a claim against them for Anderson's statement. (See *Kinsella v. Kinsella* (2020) 45 Cal.App.5th 442, 464 [the court "neither consider[s] nor express[es] a view regarding" an issue that is not supported by "argument or legal authority"].)

17

motion clarifies and supports Peterson's pursuit of claims against the Harrises which, as we shall discuss, serve as valid bases for potentially meritorious causes of action. (See *Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949 ["the SLAPP Act was 'intended to end meritless SLAPP suits early without great cost to the target' [citation], *not* to abort potentially meritorious claims due to the lack of discovery"].)

In sum, we find no error in the trial court's attribution of Anderson's statement to the Harrises when considering each cause of action. Peterson's claims against the Harrises are therefore based on (1) the implied statement Peterson lied about the gun incident involving Clifford, and (2) the express statement accusing Peterson of engaging in salacious sexual conduct. To continue with these claims, Peterson must establish minimal merit as to each claim to meet her burden. (*Baral, supra,* 1 Cal.5th at pp. 391-392; see *Finato v. Keith A. Fink & Associates* (2021) 68 Cal.App.5th 136, 148-149 [prior appeal striking particular allegations under section 425.16 barred repleading the same or "analogous" allegations by amended complaint].)

### 2. *Defamation*

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.) "If the person defamed is a public figure, [he or she] cannot

18

recover unless he proves, by clear and convincing evidence . . . the libelous statement was made with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 (*Reader's Digest*), citation omitted.)

When individuals voluntarily inject themselves or are drawn into a particular public controversy, they become public figures for a limited range of issues. (*Gertz v. Robert Welch* (1974) 418 U.S. 323, 351, accord, *Khawar v. Globe Internat.* (1998) 19 Cal.4th 254, 263.) In this case, Peterson voluntarily thrust herself into the public eye by initiating a public controversy regarding gun violence and sexual abuse in the entertainment industry. Thus, Peterson can be considered, at a minimum, a limited public figure.

Peterson marshaled evidence suggesting both statements were provably false. As to the implied statement Peterson had lied about the gun incident, Peterson averred she had endured the "traumatic experience" involving Clifford placing a gun to her head, and she stated the Harrises' denials were "false." The Harrises offered no evidence contradicting these averments. Viewed in context, the Harrises' statements implied a provably true or false statement that Peterson had lied about the gun incident. (See *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20-21; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 346 ["[c]alling someone a liar can convey a factual imputation of specific dishonest conduct"].)

19

The Harrises do not discuss any of this evidence and instead argue that their statements that Peterson had lied were in fact true. Citing Peterson's prior criminal matter in 2011, the Harrises contend Peterson "is, in fact, a proven liar." But while Peterson's criminal records may establish Peterson lied about something in 2011, they do not conclusively establish that she lied about Clifford threatening her with a gun. (Accord, *Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 691 ["Cosby would have us conclude, as a matter of law, that the gist or sting of the demand letter and press release was that Dickinson is a liar, not that Dickinson lied about the rape. This is an inference we cannot make"].)[9]

Regarding the salacious sexual accusations, Peterson declared she had "never engaged in sexual acts with either of the Harrises nor have I ever recruited woman [*sic*] to engage in sexual acts with the Harrises." These allegations are also capable of being proven true or false. (See *Briganti, supra,* 42 Cal.App.5th at p. 509 [plaintiff met her burden by denying the defendant's defamatory accusations].) The Harrises do not challenge these statements as provably false. Both statements are provable statements of fact.

---

[9] The Harrises also appear to suggest their implied statements were privileged under a "'qualified privilege of reply.'" The Harrises never raised this privilege below, and we do not consider it. (*Silk v. Feldman* (2012) 208 Cal.App.4th 547, 555; *Gallanis-Politis v. Medina* (2007) 152 Cal.App.4th 600, 615, fn. 10.)

We also conclude that, contrary to the Harrises' arguments, Peterson made the requisite showing of actual malice as a limited public figure. "'[Evidence] of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.' [Citations.] A failure to investigate [citation], anger and hostility toward the plaintiff . . . may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Reader's Digest*, *supra*, 37 Cal. 3d at pp. 257–258, fn. omitted.)

Here, the Harrises' hostility toward Peterson is so clear as to leave no substantial doubt. Their statements were responsive to Peterson's public revelation of controversial issues involving the Harrises. From the parties' dispute, a reasonable factfinder could infer the Harrises were "motivated by hostility and lacked regard for the truth of [their] publications." (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 683 (*Balla*); see *id.* at pp. 683-684 [finding "vengeance motive" behind the defendant's conduct].) In addition, Peterson averred the Harrises fabricated the salacious sexual accusations and engaged in a campaign of harassment aimed at discrediting her. The Harrises offered no evidence to contradict this evidence. Thus, Peterson has met her burden of establishing minimal merit for defamation under both of her claims.

### 3.  *False Light Invasion of Privacy*

"'False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.' [Citation.]" (*Jackson*, *supra*, 10 Cal.App.5th at p. 1264.)  "To establish a false light claim based on a defamatory publication, a plaintiff 'must meet the same requirements' as for a defamation claim."  (*Balla*, *supra*, 59 Cal.App.5th at p. 687.)

Because Peterson's cause of action for false light invasion of privacy is based on the same claims for defamation, the Harrises assert this cause of action should be stricken as "superfluous."

We agree Peterson's false light cause of action is cumulative and will add nothing to her claims for relief. (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1389, fn. 13 ["[w]hen a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or fails on whether it meets the same requirements as the defamation cause of action"]; see Civ. Code, § 3425.3.)

But "a SLAPP motion is not the proper procedural vehicle to address" cumulative or superfluous causes of action.  (*M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 637 (*M.G.*).)  Peterson met her burden of establishing minimal merit to her defamation cause of action.

Accordingly, "it cannot be said [her] lawsuit is meritless and 'brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" (*Ibid.*) For the reasons discussed above, Peterson has met her burden on her cause of action for false light invasion of privacy.[10]

### 4. *Intentional and Negligent Infliction of Emotional Distress*

"A cause of action for intentional infliction of emotional distress exists when there has been (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff has suffered severe or extreme emotional distress; and (3) the defendant's outrageous conduct was the actual and proximate causation of the emotional distress." (*Jackson, supra,* 10 Cal.App.5th at p. 1265; accord, *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050 (*Hughes*).) "There is no independent tort of negligent infliction of emotional distress. [Citation.] 'The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element. [Citations.] That duty may be

---

[10] The authorities on which the Harrises rely do not purport to strike superfluous causes of action under section 425.16. (See *McClatchy Newspapers v. Superior Court* (1987) 189 Cal.App.3d 961, 964-965 [motion for summary judgment]; *Selleck v. Globe International, Inc.* (1985) 166 Cal.App.3d 1123, 1129-1130, 1136 [demurrer].)

imposed by law, be assumed by the defendant, or exist by virtue of a special relationship.'" (*Jackson*, *supra*, at p. 1266, fn. 11, quoting *Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984 (*Potter*).)

The Harrises contend (1) both causes of action are cumulative of Peterson's claim for defamation; (2) both are based on conduct not amounting to extreme or outrageous conduct; and (3) the Harrises owed no duty of care to Peterson to sustain a negligent infliction cause of action.

First, we have already held an anti-SLAPP motion is not a vehicle for disposing superfluous causes of action. (See *M.G.*, *supra*, 89 Cal.App.4th at p. 637.)[11]

Second, we agree with the Harrises that the implied statement Peterson had lied about the gun incident, even if insulting or unflattering, did not constitute extreme or outrageous conduct. (See *Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496 ["'[t]here must still be freedom to express an unflattering opinion, *and some safety valve must be left through which irascible tempers may blow off relatively harmless steam*'"].) However, the salacious sexual accusations against Peterson, made in graphic detail, may properly be considered extreme and outrageous by a factfinder. (See *Grenier v. Taylor* (2015) 234 Cal.App.4th

---

[11]   Despite this conclusion, we agree Peterson is not entitled to independent causes of action for intentional and negligent infliction of emotional distress in this case. (See *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 34; *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 681; Civ. Code, § 3425.3.)

24

471, 486-487 [accusing plaintiff of "vile and depraved activities" may constitute outrageous behavior]; see also *Smith v. BP Lubricants USA Inc.* (2021) 64 Cal.App.5th 138, 148 ["aggravated circumstances" in which a defendant utters allegedly racist and insulting comments presents question of fact sufficient to overcome demurrer]; *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498 [same].)

Third, we agree Peterson has failed to establish a duty the Harrises owed to maintain her cause of action for negligent infliction of emotional distress. "We all have the duty to use due care to avoid injuring others" (*Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 536), but "there is no duty to avoid negligently causing emotional distress to another, . . ." (*Potter, supra*, 6 Cal.4th at p. 984.) "[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty." (*Id.* at p. 985.) Peterson has not identified "some other legal duty" required to sustain this cause of action.

Thus, Peterson has failed to meet her burden of establishing minimal merit to her cause of action for negligent infliction of emotional distress, and her cause of action for intentional infliction of emotional distress based on the implied statement she had lied about the gun incident.

25

### 5. *Trade Libel*

Trade libel is defined as an intentional disparagement of the quality of property with resultant pecuniary damage to the plaintiff. (*Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 925 (*Muddy Waters*); *Polygram Records, Inc. v. Superior Court* (1985) 170 Cal.App.3d 543, 548.) "Despite its name, '"trade libel" is not true libel and is not actionable as defamation.' [Citation.]" (*Muddy Waters*, *supra*, at p. 925.) "Whereas defamation concerns injury to the reputation of a person or business, trade libel involves false disparagement of the quality of goods or services." (*Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 340 (*Mann*); accord, *Erlich v. Etner* (1964) 224 Cal.App.2d 69, 73.)

To prevail on this cause of action, the plaintiff must prove ""'the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages.'" [Citation.]" (*Muddy Waters*, *supra*, 62 Cal.App.5th at p. 925.)

Here, the Harrises contend (1) their statements injured Peterson's personal reputation and not the quality of goods or services; and (2) there is no evidence Peterson's businesses suffered pecuniary damages. We agree.

To begin with, we note Peterson has limited her cause of action for trade libel to the salacious sexual accusations. However, these accusations bear on Peterson's reputation; they say nothing about goods or services offered by her

26

consulting or cannabis businesses.  (*Mann*, *supra*, 139 Cal.App.4th at p. 340.)

Peterson has also failed to establish pecuniary damages.  "To establish this element, "'it is not enough to show a general decline in [plaintiff's] business resulting from the falsehood, even where no other cause for it is apparent, . . .  This means, in the usual case, that the plaintiff must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived."' [Citations.]" (*Muddy Waters*, *supra*, 62 Cal.App.5th at p. 925.)  Peterson has not identified any evidence in which a particular customer, business entity, or specific contract or sale was lost as a result of the salacious sexual accusations.  That Peterson lost "30% of her personal clients and clients of Glam U" due to a tarnished reputation is not sufficient.  (See *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 109 [plaintiffs may not "rely on a general decline in business arising from the [alleged] falsehood"], overruled on another ground in *Baral*, *supra*, 1 Cal.5th 376.)

### 6.    *Interference with Prospective Economic Advantage*

A cause of action for intentional interference with prospective economic advantage requires (1) an economic relationship between the plaintiff and a third party with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the

defendant's intentional and wrongful conduct designed to interfere with or disrupt this relationship; (4) actual disruption or interference; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful conduct.  (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512.)  The plaintiff must also plead and prove "the interference was wrongful, independent of its interfering character."  (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 944; accord, *Della Penna v. Toyota Motor Sales, U.S.A.* (1995) 11 Cal.4th 376, 393.)  A cause of action for negligent interference with prospective economic advantage shares these elements with the exception of requiring only negligent conduct.  (See *North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 786.)

The Harrises contend Peterson has failed to establish (1) a wrongful act causing Peterson economic harm; and (2) a relationship with a third party with a probability of future economic benefit.  We agree with the latter contention and accordingly do not consider the former.

Peterson did not demonstrate "'the existence of an economic relationship with some third party that contains *the probability of future economic benefit* . . . .'  [Citations.]" (*Muddy Waters, supra,* 62 Cal.App.5th at p. 926, italics added.)  Peterson's evidence indicates that clients decreased, but it does not establish a probability of future economic benefit through these clients.  (Accord, *George v. eBay, Inc.* (2021) 71 Cal.App.5th 620, 639 (*George*) [referring to

28

unidentified "'repeat buyers'" insufficient when no facts show those buyers would generate future business]; *Muddy Waters, supra*, 62 Cal.App.5th at pp. 914, 926.) Nor do general averments of Peterson's inability to "attract investors" to her cannabis business suffice. (*George, supra,* at p. 639 ["tortious interference is properly dismissed where 'either the economic relationship with a third party is too attenuated or the probability of economic benefit is too speculative'"].) Peterson has failed to meet her burden on both causes of action for interference with prospective economic advantage.

## C. Attorney Fees

Peterson and the Harrises request attorney fees on appeal. We deny Peterson's request. (§§ 128.5, 425.16, subd. (c).)

We grant the Harrises' request for attorney fees based on work performed in the trial court and on appeal as a prevailing defendant under the anti-SLAPP statute. As partially successful litigants in this appeal, they are "entitled to recover attorney fees and costs incurred in moving to strike the claims on which they prevailed, but not fees and costs incurred in moving to strike the remaining claims." (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1020.)

## DISPOSITION

The portion of the court's order denying the Harrises' motion to strike the second, fourth, fifth, and seventh cause of action is reversed. The portion of the court's order denying the motion to strike the sixth cause of action based on the Harrises' implied statement Peterson had lied about the gun incident involving Clifford is also reversed. In all other respects, the order is affirmed. The Harrises are entitled to fees and costs incurred both in the trial court and on appeal in moving to strike the claims on which they prevailed. On remand, the trial court is directed to determine the amount.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MORI, J.

We concur:

COLLINS, Acting P.J.                    ZUKIN, J. *

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6, of the California Constitution.